FILED
2008 Sep-22  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **LINDA BOGUS, as Administratrix of** | } | |
| **the Estate of CHARLES AGEE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:06-CV-1667-RDP** |
| | } | |
| **ALABAMA DEPARTMENT OF** | } | |
| **CORRECTIONS, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

Before the court are two motions for summary judgment.  The first was filed on behalf of Defendants Alabama Department of Corrections ("ALDOC"), Donal Campbell, Jimmie Richburge, Charles Dean, Stephen Freeman, Brian Kukowski, Corey Oden, and Frank Parler (Doc. # 73) on April 25, 2008.  The second was filed on behalf of Defendants Stephen Bullard and James Beechem (Doc. # 75) on April 28, 2008.  Plaintiff filed her response brief (Doc. # 82) on June 2, 2008.  Defendants filed their reply briefs (Docs. # 99, 104) on June 13 and June 20, 2008, respectively.  Plaintiff filed a sur-reply (Doc. # 114) on June 30, 2008, bringing the issues raised by Defendants' motions for summary judgment under submission.

In addition to the motions for summary judgment, Plaintiff filed a Motion to Continue Pursuant to Rule 56(f) (Doc. # 93) on June 3, 2008.  Defendants also filed two motions to strike (Docs. # 106, 108) on June 20, 2008.  The issues in these motions are also fully briefed and under submission.  The court will take up these evidentiary and procedural motions before turning to the motions for summary judgment.

# I.       Plaintiff's Motion Pursuant to Federal Rule of Civil Procedure 56(f)

Plaintiff moves the court to delay ruling on the ALDOC's motion for summary judgment, asserting that she has been unfairly surprised by the fact that Defendants Kukowski, Dean, Parler, Oden, and Freeman claim the defense of qualified immunity.  (Doc. # 93 at 2).  Defendants respond by stating that Plaintiff received sufficient notice on the issues of qualified immunity and that the discovery already obtained by Plaintiff is enough to allow her to respond to Defendants' motions. (*See* Docs. # 100, 105).

Federal Rule of Civil Procedure 56(f) provides:

> If a party opposing the motion *shows by affidavit* that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)     deny the motion;
> (2)     order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3)     issue any other just order.

FED. R. CIV. P. 56(f) (emphasis added).  As an initial matter, Plaintiff filed no affidavit in support of her motion, and that omission alone is fatal to her motion.  *Id.*; *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998) (stating "[a] Rule 56(f) motion must be supported by an affidavit which sets forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment").

Furthermore, even ignoring the absence of an affidavit from Plaintiff, the court is mindful of the Eleventh Circuit's requirement that "[i]n qualified immunity cases, the Rule 56(f) balancing is done with a thumb on the side of the scale weighing against discovery." *James*, 157 F.3d at 1280. The court finds that further discovery in this case would defeat the purpose of qualified immunity – *i.e.*, protecting state actors not only from liability but from the burdens of litigation. *Lassiter v.*

*Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).  The court has a duty to adjudicate the issue of sovereign immunity as soon as practicable in order to preserve the substance of the immunity.  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (stating "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation").  The court has permitted Plaintiff to engage in discovery on the issues of jurisdiction and immunity, and that discovery is now complete.[1]  She will not be heard now to complain that the discovery to which she agreed is too little to allow for an effective response to Defendants' motions.  Moreover, to the extent that Plaintiff asserts that she should be given the opportunity to have additional discovery as to certain Defendants that had not filed a motion to dismiss or for summary judgment asserting a right to qualified immunity, the fact that these Defendants did not join earlier motions is irrelevant to adjudicating the motion present before the court.  It is undisputed and agreed by the parties that all Defendants asserted the defense of qualified immunity in their answers and that none of the Defendants have waived this defense.  Plaintiff has stated no persuasive reason why the court should delay determining the existence of the legal defense of qualified immunity, especially in light of the controlling precedents that require the court to exercise its discretion in favor of adjudicating qualified immunity as early as possible.[2]

---

[1]Indeed, Plaintiff filed an Unopposed Joint Motion for Limited Scheduling Order (Doc. # 56) on February 1, 2008 that stated "[t]he parties hereby agree that other discovery shall be stayed until the court issues its Order regarding Defendants' dispositive motions on immunity and jurisdiction." (Doc. # 56 at 2).  Neither the motion nor the court's subsequent order (Doc. # 57) contained language to suggest that the dispositive motions would be filed on behalf of only some Defendants.  The court finds that the Plaintiff had all reasonable notice that all Defendants would file dispositive motions.

[2]Plaintiff's failure to file a 56(f) affidavit is relevant to this point, also.  Plaintiff has not stated what specific discovery she requires to be able to respond effectively to Defendants' motions.  Because of the very slow pace at which this case has proceeded up to this point, as well as Plaintiff's utter failure to file an affidavit which shows what additional discovery is needed, the court is

Of course, the court's duty to address immunity must take into account the record available at this stage of litigation.  The court is mindful that neither side has engaged in full discovery and that the Rule 56 record is less developed than it could be.  Nevertheless, this is a case in which the need to address the issue of immunity cannot be put off any longer.  The Eleventh Circuit has held that the court must continue to analyze the availability of a qualified immunity defense throughout the course of litigation, from the filing of the complaint to the close of the evidence at trial.  *See Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).  As the *Johnson* court explained:

> Where it is not evident from the allegations of the complaint alone that the defendants are entitled to qualified immunity, the case will proceed to the summary judgment stage, the most typical juncture at which defendants entitled to qualified immunity are released from the threat of liability and the burden of further litigation. . . . Even at the summary judgment stage, not all defendants entitled to the protection of the qualified immunity defense will get it. The ones who should be given that protection at the summary judgment stage are those who establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity. And that will include defendants in a case where there is some dispute about the facts, but even viewing the evidence most favorably to the plaintiff the law applicable to that set of facts was not already clearly enough settled to make the defendants' conduct clearly unlawful. But if the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.

*Id.*  (citations and quotations omitted).  In light of this standard, the court will analyze evidence where it is available to see if there are disputes of fact or sufficient allegations to show that qualified immunity should be awarded *at this stage of litigation*.  The court will not impermissibly consider the merits of the action or attempt to usurp the role of the fact finder.  Plaintiff's Rule 56(f) motion is denied.

---

unwilling to allow another period of discovery.

## II.    Defendants' Motion to Strike

Defendants move to strike those portions of Plaintiff's response brief that rely upon the Death Report prepared by the Alabama Department of Corrections Investigation and Intelligence Division ("Death Report").  The ALDOC entered the Death Report into the Rule 56 record in this case.  The ALDOC's brief cited from the deposition of Jimmie Richburge, and the Death Report was attached as an exhibit to Richburge's deposition.  (Doc. # 73-10).  Defendants contend that the report should be stricken because it is both unauthenticated and inadmissible hearsay.[3]  The court will address these issues in turn.

### a.    Authentication

Defendants argue that the Death Report should be stricken because it has not been authenticated.  Richburge, in his deposition, specifically noted that he had not seen the Death Report.  (Doc. # 73-10, Deposition of Jimmie Richburge, at 15).  Plaintiff responds that the report was produced by the ALDOC and  bears a Bates Stamp, making Defendants' arguments about the Death Report dubious.  Furthermore, Plaintiff asserts that the Death Report can be authenticated by circumstantial evidence under Federal Rule of Evidence 901(b)(4).

The court agrees with Plaintiff.  Defendants have not suggested the report is a forgery.  It bears the letterhead of the Alabama Department of Corrections Investigation and Intelligence Division.  It is Bates stamped.  Furthermore, Defendant Bullard incorporated a report bearing Bates stamp "Linda Bogus 00001-00052" into his answer to an interrogatory requesting him to disclose

---

[3]Defendants also contend that the Death Report should be excluded as unduly prejudicial under Federal Rule of Evidence 403.  The court will not address this issue, as the task of weighing evidence is not one it must undertake on summary judgment.  Defendants are free to file motions in limine to have unduly prejudicial evidence excluded from consideration by the trier of fact at the appropriate time.

all investigations in which he participated that examined incidents of violence.  (Doc. # 110-3, Interrogatory Responses of Bullard, at 5-6).  The Death Report bears these same Bates stamp numbers.

A document with the Death Report's pedigree satisfies the requirements of Rule 901, at least with respect to its proper inclusion in the Rule 56 file.  Bullard's interrogatory response strongly indicates that the report in evidence is in fact the report completed by the Alabama Department of Corrections Investigation and Intelligence Division.  Testimony by a person with personal knowledge, such as Defendant Bullard in this instance, is one example of evidence sufficient to authenticate a document.  FED. R. EVID. 901(b)(1).  Even though Bullard testified to his limited involvement in the investigation of the facts and the production of the report, his limited involvement still gives him personal knowledge of the report.  Furthermore, even beyond Bullard's testimony, the Death Report is authentic under Rule 901(b)(4).  This rule provides that a document may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  FED. R. EVID. 901(b)(4).  The fact that the Death Report contains pictures of the inside of the prison, pictures of Mr. Agee's body, and an intimate familiarity with prison procedures strongly suggests that it was made by the Investigations and Intelligence Division.  When these distinctive characteristics are paired with the undisputed fact that the report was produced from the files of the ALDOC, the court is satisfied that the circumstances surrounding the Death Report show that it may be considered with respect to the pending motions.

### b.       Hearsay

The Death Report presents two hearsay problems: (1) the report itself is hearsay; and (2) the report contains statements that are hearsay or hearsay-within-hearsay.  The court will take up these issues in turn.

### 1.       The Death Report as Hearsay

Defendants contend that the Death Report is inadmissible hearsay and is due to be stricken. Plaintiffs respond that the report falls under the hearsay exception in Federal Rule of Evidence 803(8)(C), which excepts public records and reports from the general rule that hearsay is inadmissible.  The court agrees with Plaintiff.

Rule 803(8) provides that the following governmental records are excepted from exclusion as hearsay:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8).  The parties do not dispute that the Death Report contains "factual findings resulting from an investigation made pursuant to authority granted by law."  As a result, the court must determine whether the sources of information or other circumstances show that the report is not trustworthy.  The burden of showing untrustworthiness is upon Defendants.  *See id.*, advisory committee's note to paragraph (8) (stating "the rule. . . assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present").

7

In applying the trustworthiness requirement of Rule 803(8)(C), the Eleventh Circuit has not set a high bar for admissibility. In *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196 (11th Cir. 1986), the court excluded a Congressional report that "did not contain the factual findings necessary to an objective investigation, but consisted of the rather heated conclusions of a politically motivated hearing." *Baker,* 793 F.2d at 1199. Earlier, in *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir. 1985), the court found no abuse of discretion in the trial court's decision to exclude a report that was:

> strong, suspect because of its brevity, dealt with the ultimate issue, failed to afford the possibility of cross-examination, and the probability of harm by its admission greatly outweighed its probative value. Also because the report was conclusory and a synopsis of one man's thoughts; because Ensley was physically available within 100 miles and so subject to subpoena, a motion for which the court indicated it would entertain with more interest and more probability of success.

*Wilson*, 757 F.2d at 1245 (citations and quotations omitted).

The Death Report lacks many of these troubling characteristics. The report appears to be objective in tone and content. It contains not only conclusions derived from the investigation into Mr. Agee's death but also much of the evidence used to draw those conclusions. It is not suspiciously short or marked by any apparent slant or bias. According to Defendants' admission, at least two people were involved in producing the report. (Doc. # 115 at 5).

Furthermore, Defendants do not challenge the factual findings contained in the report. To the contrary, the official findings of the Death Report tend to support Defendants' position that Mr. Agee's death resulted from the legitimate use of force. (Death Report, Bates 14-16). Defendants' objection to the report relates almost exclusively to the statements given by inmates who were in the cell block where the events that led to Mr. Agee's death occurred. These statements present a double

8

hearsay problem and the court will therefore consider their admissibility separately from the issues pertaining to the Death Report in general.

## 2. Hearsay Contained in the Death Report

The exception contained in Rule 803(8)(C) only applies to the Death Report itself; Federal Rule of Evidence 805 provides that a hearsay statement contained within another hearsay statement is only admissible if "each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805.  As a result, statements contained within the Death Report present an additional hearsay problem beyond the admissibility of the report as a whole.  *See U.S. v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) (stating "hearsay statements by third persons. . . are not admissible under [the 803(8)] exception merely because they appear within public records"); *U.S. v. Snyder*, 787 F.2d 1429, 1433-34 (10th Cir. 1986) (finding that third-party statements contained in a business record admitted under Federal Rule of Evidence 803(6) were double hearsay and not admissible).  Of particular concern are statements made by several inmates who witnessed the events that allegedly caused Mr. Agee's death.  These statements are summarized on pages nine through eleven of the Death Report.  In the court's reading, the written statements are closer to a transcript[4] of what the witnesses told the interviewer than summaries of the interviewer's impressions or conclusions about the witnesses' statements.[5]  Moreover, Plaintiff relies upon these

---

[4]The Death Report introduces the statements by noting that "[t]hese interviews were tape recorded and transcribed.  A synopsis of the twenty-three interviews is as follows." (Death Report at Bates 00009).

[5]In the alternative, if the statements are summaries of the interviewers' impressions, they would constitute findings of fact under Rule 803(8)(C) and would not be excluded as inadmissible hearsay.  Defendants have not carried their burden of showing that the interviewing officers are untrustworthy as sources of information or that the other circumstances indicate untrustworthiness.
The Third Circuit's opinion in *Clark v. Clabaugh*, 20 F.3d 1290 (3rd Cir. 1994) is instructive

statements for the truth asserted in them – *i.e.*, that the inmates' statements accurately reflect the events that led to Mr. Agee's death.  Accordingly, these statements are hearsay.  To be sure, Plaintiff has not shown that these statements fit within any hearsay exception and the court concludes that no exception applies.  The statements are hearsay.

Of course, merely observing that the statements are hearsay does not put an end to the inquiry.  Inadmissible hearsay may be used to show the existence of a material issue of fact in opposing a motion for summary judgment.  As Supreme Court has stated:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and

---

on this point.  In *Clark*, the court upheld the district court's decision to allow a report prepared by the Pennsylvania State Police (the "PSP Report") to be considered on summary judgment.  *Clark*, 20 F.3d at 1294-95.  The report was the fruit of an investigation into a period of racial unrest in Hannover, Pennsylvania.  *Id.* at 1293.  The plaintiffs in *Clark* alleged that the police violated their civil rights.  *Id.* at 1292.  In opposing the defendants' motion for summary judgment, the plaintiffs "relied virtually exclusively" on the PSP Report.  *Id.* at 1294.  The defendants moved to strike.

In affirming the district court's decision to allow the PSP Report, the *Clark* court found it important that "[t]he investigating officers and authors of the Report were not and are not now parties to the litigation."  *Id.* at 1295.  The defendants contended that the statements in the Report given by parties to the litigation were untrustworthy, but the court noted that "the bias of those interviewed does not render the PSP Report itself inherently untrustworthy, and such bias cannot be imputed to the investigating officers."  *Id.*

The issues before this court is very nearly identical to the issue in *Clark*.  The PSP Report, like the Death Report, was "unsworn, authored by an investigator who did not have personal knowledge, and which contains opinion based on hearsay."  *Id.* at 1294.  Like the defendants in *Clark*, Defendants have moved to strike the report as untrustworthy; however, even if the court were to assume, *arguendo*, that the prisoners are not reliable sources of objective information about the events that led to Mr. Agee's death, there would still be no reason to impute their untrustworthiness to the officers who prepared the Death Report.  The reliability of the investigating officers has not been sufficiently brought into question to cause the court to doubt the trustworthiness of the Death Report, especially in light of the early stage of litigation and the fact that Plaintiff has not had the opportunity to engage in full discovery at this point.

it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The Eleventh Circuit interprets this passage "as simply allowing otherwise admissible evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form."  *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis supplied).  Specifically, "we do not read [the binding precedent] to hold that inadmissible hearsay may be used even when it cannot be reduced to admissible evidence at trial."  *Id.* at 1585.  This court must then determine whether the hearsay in this instance can be reduced to admissible evidence at trial.

The court concludes that the hearsay contained in the Death Report can be remedied before trial.  The prisoners whose statements are recorded in the report could be deposed, and the party taking that deposition could present the deposition at trial if the deponent were unavailable.  The prisoners could also appear at trial if they are available.  The fact that substantive discovery has not yet begun is a factor that weighs in favor of a conclusion that at trial Plaintiff would be able to cure the hearsay problem.[6]  In light of the fact that the hearsay problem presented by the contents of the Death Report is merely a problem of form that can be remedied before or at trial, the court finds that the otherwise inadmissible hearsay contained in the Death Report is proper evidence for consideration in the Rule 56 record and is not due to be stricken.  Accordingly, the court will draw from the Death Report in describing the facts relevant to the issues raised in Defendants' motions for summary judgment.

---

[6]Indeed, nothing in this order prevents Defendants from moving for summary judgment on all the issues in the case at the close of discovery or any other appropriate time.

### III.   UNDISPUTED FACTS

The complaint in this case alleges that Defendants caused the death of an Alabama Department of Corrections inmate, Charles Agee, in violation of his constitutional rights. Before exploring the events that led to Mr. Agee's death, it is necessary to discuss relevant information about the parties involved.

### a.   The Parties

The decedent, Charles Agee, was a prisoner at the Donaldson Correctional Facility ("Donaldson"). (Doc. # 71 ("Complaint") at ¶ 18).[7] He was diagnosed with acute paranoid schizophrenic disorder in 1995 and was therefore housed in "5 Block," Donaldson's residential treatment unit for mentally ill inmates. (*Id*.). Plaintiff Linda Bogus is the administratrix of Mr. Agee's estate. (*Id*. at ¶ 5).

The Alabama Department of Corrections is the entity of the State of Alabama charged with operating Donaldson. (*Id*. at ¶ 7). Donaldson is a state-run maximum security prison and has a Mental Health Unit for housing prisoners with mental impairments and long sentences. (*Id*. at ¶ 17). Donal Campbell was the commissioner of ALDOC during the relevant time. (Complaint at ¶ 8). Charles Dean, Stephen Freeman, Brian Kukowski, Corey Oden, and Frank Parler were all correctional officers at Donaldson. (*Id*. at ¶¶ 12-16). James Beechem was also a correctional officer at Donaldson, and he worked in 5 Block. (Doc. # 75-5, Declaration of James Beechem, at ¶¶ 2-3). Captain Jimmie Richburge was the immediate supervisor of those correction officers at Donaldson involved in the events that gave rise to this action. (Complaint at ¶ 11). Stephen Bullard was the

---

[7]The court will refer to Doc. # 71 as "the Complaint." In fact, this document is the Revised Second Amended Complaint, but it supersedes all prior pleadings. For the purposes of defining the nature and scope of Plaintiff's claims, it is the only relevant pleading.

chief warden of Donaldson from August 2001 to March 2005.  (Doc. # 75-2, Deposition of Stephen Bullard, at 62 and 11-12).  He retired in 2007 and no longer works for ALDOC.  (Doc. # 75-4, Declaration of Stephen Bullard, at ¶ 10).

**b.**     **The Events of January 21, 2005**

On January 21, 2005, Agee and several other inmates were in common area of 5 Block. (Complaint at ¶ 19).  All of the inmates in the common area were supposed to be participating in a group therapy session, but Agee was not participating.  (*Id*.).  Officer Beechem was supervising prisoners taking part in the group therapy session.  (Beechem Declaration at ¶ 3).  There were four other officers assigned to 5 Block at that time: Michael Pittman, Jim Jackson, Reginald Bolling, and Jackie Martin.  (*Id*.).  Officer Martin was assigned to the cubicle overlooking cellblock.  (*Id*.).  It is unclear where exactly in 5 Block the officers were when Officer Beechem began to confront Mr. Agee.  Officer Beechem was unarmed except for a can of aerosol deterrent spray called "Freeze +P." (Death Report at Bates 00002).

As noted above, Mr. Agee was not participating in the group therapy session.  Officer Beechem had already instructed all the inmates that they either had to participate in the group therapy or return to their cells.  (Beechem Declaration at ¶ 4).  Officer Beechem gave Mr. Agee specific instructions to either join the session or return to his cell.  (*Id*. at ¶ 5).  Agee responded that he was not going to join the group.  (*Id*.).  He then picked up a chair and told Officer Beechem that he was going to take the chair to his cell.  (*Id*.).  Officer Beechem told Mr. Agee that he could not take the chair with him, but Agee insisted that he was going to take the chair with him.  (*Id*.).  It is undisputed that Mr. Agee was "padded up," meaning that he was wearing eight additional layers of clothing in anticipation of a physical altercation.  (Death Report at Bates 000015).  Officer Beechem reached

13

out and took hold the chair, but Mr. Agee also grasped it and would not let go.  (Beechem Declaration at ¶ 6).  Again, Officer Beechem ordered Mr. Agee to release the chair and go to his cell, but Mr. Agee threatened Officer Beechem to the effect of "If you don't let go of my chair, I'm going to hit you upside the head with it."  (*Id.*).

At this point, Officer Beechem removed his can of Freeze +P from its holder.  (*Id.*).  On seeing the deterrent spray, Mr. Agee threatened Officer Beechem again, saying something like "If you spray me with that shit, I'm going to bust you up."  (*Id.*).  Officer Beechem replied that he had given Mr. Agee "break after break" but that he had told Mr. Agee that he would not be permitted to hit him with the chair.  (*Id.*).  At that moment, Mr. Agee jerked the chair away from Officer Beechem's grip and swung it at Officer Beechem, striking him in the forearm.  (*Id.*).

About this time, a Code Red was called.  (*Id.* at ¶ 7).  Officer Beechem, holding onto the chair with one hand, sprayed Mr. Agee with the Freeze +P spray.  (*Id*)  He observed no effect on Mr. Agee resulting from the spray.  (*Id.*).  Mr. Agee and Officer Beechem continued to hold onto the chair, and Mr. Agee began to move in a circle.  (*Id.*).  Officer Beechem fell to the floor, twisting his ankle and hitting the wall.  (*Id.*).  Mr. Agee threw the chair at him.  (*Id*)

Officer Pittman, responding the Code Red, arrived on the scene and, taking out his baton, hit Mr. Agee with it a few times.  (*Id.* at ¶ 8).  Mr. Agee refused to get on the ground and struggled with Officer Pittman.  (*Id.*).  Officer Beechem regained his feet and punched Mr. Agee twice with a closed fist above the navel.  (*Id.*).  At this point, Mr. Agee slumped over and fell to the floor.  (*Id.*).  Also, Officer Jackson arrived on the scene of the altercation.  (*Id.*).

Officers Beechem, Pittman, Jackson, Freeman, and Bolling continued to struggle with Mr. Agee and attempted to subdue him.  (*Id.*).  At this point, the evidentiary accounts begin to diverge.

14

Officer Beechem has stated that Officer Jackson helped subdue and handcuff Mr. Agee and that all application of force ceased as soon as Mr. Agee was handcuffed. (*Id*. at ¶¶ 8-9). The Death Report concludes that Officer Jackson "assisted in gaining control of inmate Agee. . . by placing his knee on the upper left side of inmate Agee." (Death Report at Bates 00004). However, several inmates who witnessed the scene stated that they saw one or all of the officers kicking Mr. Agee in the head and side. (*Id*. at Bates 00009-11). While most of these accusations center on Officer Jackson, who is not a party to this action, several of the accusations list Officer Beechem as one of the people kicking Mr. Agee. (*Id*.).

The evidence is undisputed that, at least prior to his arrival in the infirmary, the immediate application of force ceased when Mr. Agee was handcuffed. (*Id*. at 00015). The officers moved Agee to out of the day room and into the cellblock corridor. (*Id*.). Captain Richburge arrived after a few minutes and found Officers Jackson and Beechem with Mr. Agee in the corridor. (*Id*.). He ordered Officers Parler, Kukowski, Oden to take custody of Mr. Agee and take him to the infirmary for examination and treatment. (Beechem Declaration at ¶ 10). At some point, Officers Dean and Freeman joined Officers Parler, Kukowski, and Oden in transporting Mr. Agee. (Death Report at 000015). Mr. Agee was able to stand and talk when he came out of 5 Block and when Captain Richburge ordered the Transporting Officers to take him to the infirmary. (Richburge Deposition at 17-18). He was not bleeding. (*Id*.).

The Officers, while leading Mr. Agee to the infirmary, determined that he was unresponsive and began to carry him. (Death Report at 15.). Officer Parler held Mr. Agee's left arm; Officer Dean held his right arm; Officer Oden took the left leg; and Officer Kukowski took Mr. Agee's right leg. (*Id*.). Carrying Mr. Agee in this manner, the five officers arrived at the infirmary.

15

In the infirmary, the officers carried Mr. Agee to a plastic chair next to the triage desk.  (*Id*).  The officers put Mr. Agee in the chair while handcuffed.  (*Id*.).  According to Nurse Tennisha Shamburger, who was sitting at the triage desk, the officers threw Mr. Agee into the chair with force.  (*Id*.).  There were three officers who were in front of Mr. Agee: Officers Dean, Parler, and Kukowski.  (*Id*.).  As a result, the chair containing Mr. Agee fell back and he his head struck a cubicle wall behind him.  (*Id*.).  He continued to fall and landed on the floor on his right side, also suffering a cut to the right side of his forehead.  (*Id*.).  Officer Freeman was struck by Mr. Agee as he was falling and Officer Freeman fell to the ground as well.  (*Id*.).  Officers Dean and Freeman lifted Mr. Agee from the floor and put him back in the chair.  (*Id*.).  He fell from the chair again, sliding downward and slumping upon the floor.  (*Id*.).

It became apparent to the officers that Mr. Agee was in need of medical attention.  His handcuffs were removed and he was placed upon a stretcher.  (*Id*.).  Shortly thereafter, medical staff began performing CPR on Mr. Agee.  (*Id*.).  He was pronounced dead at 2:14 pm.  (*Id*. at Bates 00016).  The cause of death was exsanguination caused by Mr. Agee's spleen rupturing during his altercation with the guards.  (*Id*.).  He sustained four broken ribs on his right side and these ribs punctured his lung and lacerated his spleen.  (Complaint at ¶ 35).

## IV.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment when it can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of

a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative

17

evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to show affirmatively the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## V.    ANALYSIS

There are two distinct sets of claims in this case: (1) constitutional claims under 28 U.S.C. § 1983; and (2) state law claims under 28 U.S.C. § 1367.  Because different law applies to these various types of claims, the court will analyze them in turn.  Finally, the court will consider whether Plaintiff was required to comply with the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

### a.        Constitutional Claims: Excessive Force and Deliberate Indifference

The Defendants fall into three subsets: (1) Officer Beechem, who is alleged to have participated in beating Mr. Agee; (2) Officers Dean, Parler, Freeman, Kukowski, and Oden (the "Transporting Defendants") who took Mr. Agee from 5 Block to the infirmary, and (3) Warden Bullard, Captain Richburge, and Commissioner Campbell (the "Supervisory Defendants").   The court will analyze Plaintiff's claims against these subsets of Defendants separately.

### i.        Officer Beechem

Plaintiff makes four claims against Officer Beechem.  First, she claims that Officer Beechem both employed excessive force against Mr. Agee and failed to prevent others from using excessive force against him.  (Complaint, Count II, at ¶¶ 75-85).  She also claims that Officer Beechem was deliberately indifferent to Mr. Agee's mental health (*id.*, Count I, at ¶¶ 65-74) and medical (*id.*, Count IV, at ¶¶ 96-102) needs.

Each of the Defendants has raised the affirmative defense of qualified immunity, which is designed to greatly limit litigation against officers (and other state actors) in their individual capacities.  Accordingly, the court will analyze the parameters of that doctrine, and this discussion applies to all the Defendants.  The purpose of qualified immunity is "to ensure that before they are subjected to suit, [police] officers are on notice [that] their conduct is unlawful."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  Therefore, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [the officer] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Indeed, the defense is so broad that only those officers who are "plainly incompetent and those who knowingly violate the law" are

19

required to defend against individual liability claims. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998). The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).

To be entitled to qualified immunity, a defendant must establish "that he [] acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).[8] Once this is proven, the burden shifts to the plaintiff to show that qualified immunity is not applicable. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

"In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Crosby*, 394 F.3d at 1332. "The threshold inquiry is whether plaintiff's assertions, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If the court determines that the plaintiff has not alleged a deprivation of a constitutional right, then the inquiry ends. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).

However, if the court determines that a plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to "whether that right allegedly implicated was

---

[8] The term 'discretionary authority' includes all acts of a governmental official that are (1) undertaken pursuant to the performance of official duties and (2) within the scope of the official's authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). It is undisputed that, during the events in question, the Defendants were acting in their capacities as correction officers. Therefore, their acts were within the scope of their discretionary authority.

clearly established at the time of the events in question." *Lewis*, 523 U.S. at 841 n. 5. "Clearly

established" rights must be "developed [] in a concrete factual context so as to make it obvious to

a reasonable government actor that his actions violate federal law." *Anderson v. Creighton*, 483 U.S.

635, 640 (1987).[9]

> While officials must have fair warning that their acts are unconstitutional, there need
> not be a case "on all fours," with materially identical facts, before we will allow suits
> against them. A principle of constitutional law can be "clearly established" even if
> there are "notable factual distinctions between the precedents relied on and the cases
> then before the Court, so long as the prior decisions gave reasonable warning that the
> conduct at issue violated constitutional rights."

*Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)(quoting *United States v. Lanier*, 520

U.S. 259, 269 (1997) and *Hope v. Pelzer*, 536 U.S. 730 (2002)).[10]  Only Supreme Court, Eleventh

---

[9] There is a temporal requirement related to this inquiry.  A plaintiff must show that a
reasonable public officer would not have believed his actions to be lawful in light of law that was
clearly established *at the time* of the purported violation.  *Anderson v. Creighton*, 483 U.S. 635, 641
(1987); *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

[10] The Eleventh Circuit has explained:

The Supreme Court, in *Hope*, cautions against a "rigid gloss on the qualified
immunity standard" that would require materially similar, preexisting cases in all
circumstances when the qualified immunity defense is to be overcome. *Hope*, 122
S.Ct. at 2512. Such a "rigid gloss" would be in variance with the law of the Supreme
Court and the law of this Circuit. We have denied qualified immunity in the absence
of precedents with similar facts. We have said, in the context of excessive force
cases, that an official's conduct could run so afoul of constitutional protections that
fair warning was present even when particularized caselaw was absent: "the official's
conduct was so far beyond the hazy border between excessive and acceptable force
that [the official] had to know he was violating the Constitution even without caselaw
on point." *Priester*, 208 F.3d at 926 (internal quotation marks omitted and second
alteration in original).

*Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).

Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

**A.      Excessive Force**

It is well-settled that the use of excessive force violates the Fourth Amendment. *Thorton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (determining that officers' use of any force violates clearly established law when officers do not suspect that arrestee has committed any serious crime and arrestee neither poses immediate threat of harm nor actively resists arrest) (citing *Graham v. Connor*, 490 U.S. 386, 394 (clearly establishing that use of excessive force in carrying out arrest constitutes Fourth Amendment violation)).  In analyzing an excessive force claim to determine whether the plaintiff has alleged deprivation of a constitutional right, the key inquiry "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  The court must be mindful to judge an officer's acts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Moreover, the court must allow for the fact that officers "must often make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

From this perspective, the court must evaluate both whether any force was necessary and, if some force was justified, whether the amount of force used was reasonable.  In evaluating the need for application of force in a custodial setting, "force is deemed legitimate as long as it is applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm." *Skrtich v. Thornton*, 280 F.2d 1295, 1300 (11th Cir. 2002) (quotations, textual marks, and

citations omitted).  In determining whether force is applied maliciously or sadistically, the following factors are considered: the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response ." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citations and quotations omitted).  The extent of the prisoner's injury must also be considered. *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) (adding *Whitley*'s injury factor to the four enumerated in *Hudson*).[11]

In applying these factors to the conduct of Officer Beechem, the court concludes that material issues of fact preclude finding that Officer Beechem has qualified immunity at this stage of the litigation.  The threshold issue is whether Officer Beechem was acting within the scope of his discretionary authority.  Plaintiff challenges that Officer Beechem acted outside his discretionary authority by attempting to get Mr. Agee to return to his cell and relinquish the chair he was carrying. (Doc. # 82 at 22).  She asserts that Officer Beechem should have stepped backed and sought assistance before engaging Mr. Agee.  (*Id*.).  This argument fails.  Officer Beechem "can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his

---

[11]Plaintiff relies heavily on language from *Skrtich* that states "a defense of qualified immunity is not available in cases alleging excessive force. . . because the use of force maliciously and sadistically to cause harm is clearly established to be a violation of the Constitution."  *Skrtich*, 280 F.3d at 1301 (quotations and citations omitted).  The court does not read this passage to stand for the sweeping proposition for which Plaintiff cites it.  Instead, it merely explains that when a plaintiff has made allegations of excessive force sufficient to survive a motion to dismiss, there is no need to perform a separate analysis of qualified immunity because it is well-established that excessive force violates clearly established law.  *Id.* (stating "[t]he only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment.  If he has done so, that is the end of the inquiry").

duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). The court finds that the undisputed evidence in the Rule 56 record shows that Officer Beechem was acting as a prison guard and within the scope of his duties during the events that gave rise to this case. Certainly it is within the duties and discretion of a prison guard to ask a prisoner to return to his cell.

Accordingly, the court turns to whether Officer Beechem used excessive force against Mr. Agee when he attempted to subdue him.

### 1.     The Extent of Mr. Agee's Injuries

The first factor to be addressed is the extent of Mr. Agee's injuries. The undisputed evidence shows that Mr. Agee died from exsanguination resulting from a ruptured spleen. Furthermore, the undisputed evidence shows that Mr. Agee's spleen was ruptured as a result of his breaking four ribs in his altercation with the guards attempting to subdue him. While Mr. Agee may have had certain conditions that made his spleen more vulnerable than the general population, the court finds that four broken ribs constitute a severe injury and indicate that the guards used very strong force against Mr. Agee.

### 2.     The Need for the Application of Force

The undisputed evidence shows that Officer Beechem was justified in using force against Mr. Agee. Mr. Agee repeatedly and openly defied Officer Beechem's clear instructions and became increasingly threatening towards Officer Beechem. Moreover, Officer Beechem and Mr. Agee were in close proximity to several inmates participating in a group therapy session, making the possibility of a large conflagration of violence possible. When Officer Beechem attempted to take the chair from Mr. Agee, Mr. Agee tried physically to resist Officer Beechem's efforts. Physical resistance

by inmates justifies some use of force by a guard.  *See Skrtich*, 280 F.3d at 1301.  Once Officer

Beechem applied the Freeze +P spray, Mr. Agee became aggressive and violent.  At this point,

Officer Beechem was justified in using whatever force was necessary to restrain Mr. Agee and

prevent additional violence or the beginning of a riot.  *Ort v. White*, 813 F.2d 318, 325 (11th Cir.

1987) ("Prison officers must, however, have the authority to use that amount of force or those

coercive measures reasonably necessary to enforce an inmate's compliance with valid prison rules

and to protect themselves and the other inmates").  This justification continued until Mr. Agee was

handcuffed or otherwise subdued.  *Skrtich*, 280 F.3d at 1303 (finding that prison officials were not

entitled to qualified immunity where they had continued to beat an inmate in custody "when he [was]

incapacitated, and no longer able to pose a threat to the guards' ability to maintain order, resist the

guards' directives, or engaged in disruptive behavior").  The court finds that Officer Beechem

reasonably perceived that he needed to use force in light of the circumstances apparent to him at the

time.

### 3.    The Relationship Between the Need for Force and the Amount of Force Used

It is in the analysis of this factor–relationship to the force used and the need for force–that

material issues of fact arise which preclude summary judgment in Officer Beechem's favor.  The

Rule 56 record contains evidence that Officer Beechem kicked Mr. Agee in the head and side while

Mr. Agee was on the floor.[12]  (*See* Death Report at Bates 00009-000011).  While there is no *per se*

---

[12]The inmates' accounts of the altercation are hardly consistent in identifying which officers were involved or what force was applied to Mr. Agee.  However, several inmates name Officer Beechem as an officer involved in kicking Mr. Agee.  Also, the court is mindful of the Eleventh Circuit's clear statement that "we reject the argument that the force administered by each defendant in this collective beating must be analyzed separately to determine which of the defendants' blows, if any, used excessive force."  *Skrtich*, 290 F.3d at 1302.  While no other officers involved in the

rule that kicking a violent and uncooperative inmate is excessive force, the court concludes that there is a material issue of fact as to whether it was excessive under the circumstances of this case.[13]  Mr. Agee was on the floor and at least three officers, including Officer Beechem, were standing over him.  With their numerical superiority and in light of the fact that Mr. Agee had been forced to the ground, the court cannot say that Officer Beechem's kicking Mr. Agee in the side and the head was needed to protect himself, the other officers, or the inmates.

Without the evidence of kicking, there likely would be no issue of fact as to whether Officer Beechem employed force in excess of the need to force.  Using Freeze +P was not excessive in this instance.  *See Ort,* 813 F.2d at 324-25 (11th Cir. 1987) (finding that the use of mace was not excessive force and was an "immediate coercive [measure] necessary to restore order or security").  Likewise, the record does not suggest that Officer Beechem's two punches were not out of proportion to the need for force.  The former Fifth Circuit, in a decision binding on this court, held that a district court did not err in finding that a choke hold administered to an aggressive arrestee that caused the

---

altercation besides Officer Beechem are parties to this action, the court finds that the logic of *Skrtich* applies to this situation – it would be inappropriate to grant summary judgment to Officer Beechem where there is evidence that he repeatedly kicked Mr. Agee.

[13]Of particular note is that nothing in the Rule 56 record shows that Officer Beechem knew that Mr. Agee was "padded up," dressed with multiple layers of clothing in anticipation of an altercation.  The Death Report states unequivocally that Mr. Agee was padded up prior to his altercation with Officer Beechem.  (Death Report at Bates 00004).  He was wearing eight additional layers of clothing.  (*Id.*).  If there were competent evidence in the Rule 56 record that Officer Beechem knew or observed that Mr. Agee was wearing so many layers of protective clothing, the analysis of the force applied and the need for force might be different.

arrestee's death did not rise to the level of excessive force.[14]  *Williams v. Kelley*, 624 F.2d 695, 698 (5th Cir. 1980).

The court's conclusion that Officer Beechem's two punches were not excessive is not dependent upon the fact that the Rule 56 record shows a factual dispute as to whether any officer actually kicked Mr. Agee.  Even if the evidence finally shows that Mr. Agee was not kicked and that Officer Beechem's punches caused the fatal injuries, there is no basis for finding these punches excessive.  There is no dispute of fact that Officer Beechem was faced with a violent, defiant inmate in a volatile situation in which had already resulted in Officer Beechem being injured.  Two punches to the body are not excessive and do not constitute a violation of clearly established law.  *Id.* (stating "[t]he officers' efforts at that point [including the administering of a choke hold] were clearly made in order to protect their own safety, as well as that of [the prisoner] and the third floor in general").

### 4.    The Threat Reasonably Perceived by Officer Beechem

The undisputed evidence shows that Officer Beechem reasonably perceived a severe threat to his safety, the safety of other officers, and the safety of the inmates.  Mr. Agee's confrontation with the Officer Beechem took place in a common room containing several 5 Block inmates participating in a group therapy session.  Mr. Agee threatened physical harm to Officer Beechem at least twice. Moreover, as the confrontation progressed and turned to a physical instead of verbal exchange, Mr. Agee caused Officer Beechem to fall to the ground, leaving Officer Beechem with an injured ankle and exposed in a vulnerable position.  The altercation was serious enough to trigger a Code Red and to warrant the involvement of several other officers.  Under these circumstances, it is reasonable that

---

[14]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Officer Beechem perceived the need for the rapid and severe application of force.  Indeed, by the time Officer Beechem punched Mr. Agee, Mr. Agee had already assaulted Officer Beechem.  Under less egregious facts, the Eleventh Circuit has held that deadly force is justified.  *See, e.g., Williams*, 624 F.2d at 698 (finding no excessive force where an officer applied a choke hold to an arrestee resisting the officer's attempts to make him move to a different room and caused the arrestee to die from strangulation).  It is hard to imagine a situation in which a state actor would have a more reasonable apprehension of the need to use force than the situation Officer Beechem found himself in on January 21, 2005.

### 5. Efforts Made to Temper the Severity of a Forceful Response

The court is also satisfied that initially Officer Beechem attempted to use less forceful means on Mr. Agee before resorting to higher degrees of force.  As has been discussed *supra*, but for the Rule 56 evidence that Officer Beechem kicked Mr. Agee in the head and side, the court would have no basis  for finding that Plaintiff had a colorable claim of excessive force.  Officer Beechem gave Mr. Agee several clear instructions that Mr. Agee refused.  Next, Officer Beechem attempted to remove the chair from Mr. Agee's possession but did not attempt to touch or apply force to Mr. Agee directly.  When that course of action failed, Officer Beechem warned that he would use the Freeze +P spray.  Only after Mr. Agee continued his defiance and aggression did Officer Beechem spray him.  When the spray did not disable Mr. Agee and when Mr. Agee caused Officer Beechem to fall in be injured, Officer Beechem finally resorted to punches.  In this entire escalation, Officer Beechem showed restraint.  It is only when the force employed turned to kicking Mr. Agee on the floor that an issue of fact arises that Officer Beechem failed to temper the degree of force he used.

In sum, the evidence that Officer Beechem kicked Mr. Agee while Mr. Agee was on the ground and not presenting a danger to those around him creates an issue of fact as to whether the force employed was excessive given the circumstances. The question is exceedingly close, but the disputes of fact in the Rule 56 record make summary judgment inappropriate at this early stage of litigation, even with respect to the qualified immunity defense.

### B.      Failure to Intervene as Excessive Force

Plaintiff also alleges that Officer Beechem is liable for failure to intervene in the other officers' use of excessive force against Mr. Agee. The court rejects this argument because Plaintiff has failed to show that Officer Beechem had an opportunity to prevent any excessive force employed by the other officers.

It is well-established that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Skrtich*, 280 F.3d at 1302. However, "it must also be true that the non-intervening officer was in a position to intervene yet failed to do so." *Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008). The Eleventh Circuit has recognized that whether an officer is "in a position to intervene" has a temporal element. *Id.*, (holding that an officer could not have intervened to prevent another officer from suddenly punching an arrestee).

In this case, even accepting Plaintiff's allegations as true and assuming that the other officers were employing excessive force, Plaintiff has not shown that Officer Beechem was in a position to stop the other officers' actions. It is undisputed that Mr. Agee continued to resist the officers until he was handcuffed. While his resistence continued, each of the officers was free to use force to subdue him. There is also no indication at all that any officer used any force against Mr. Agee after

29

he was handcuffed.  According to the evidence of record and Plaintiff's accusations, any kicking of

Mr. Agee lasted only a few seconds.  It is unreasonable as a matter of law to require an officer to

check his own use of force, determine the state of a resisting inmate, examine his fellow officers'

applications of force, and act to prevent the any excessive force issues in time to prevent kicks that

took only seconds to take place.[15]  The court is mindful that "'government officials are not required

to err on the side of caution' when it comes to avoiding constitutional violations." *Crosby v. Monroe*

*County*, 394 F.3d 1328, 1334 (11th Cir. 2004) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1030

n. 8 (11th Cir. 2001) (en banc)).  While the court has concluded that there is a question of fact as to

whether Officer Beechem used excessive force, the court finds that no such question exists as to his

failure to stop his fellow officers from exercising excessive force.  Plaintiff has failed to allege or

produce facts sufficient to show that he had the time to intervene.

### C.    Deliberate Indifference to Mr. Agee's Mental Health

Plaintiff makes two claims of deliberate indifference.  The first asserts that Officer Beechem

was deliberately indifferent to Mr. Agee's mental health by (1) failing to request assistance by a

mental health professional and (2) failing to use less-violent means in subduing Mr. Agee.  Both of

these claims fail as a matter of law.

As an initial matter, Plaintiff urges that these facts are properly analyzed under a deliberate

indifference standard.  In *Whitley v. Albers*, 475 U.S. 312 (1986), the Supreme Court held that the

---

[15]The undisputed evidence shows that the officers handcuffed Mr. Agee as soon as they could and did not extend their use of force any longer than they felt necessary to subdue him.  Officer Jackson, the officer who handcuffed Mr. Agee, had to put his knee on Mr. Agee's back to cause Mr. Agee to be still enough to handcuff.  (Death Report at Bates 000015).  Even if an officer was kicking Mr. Agee (and again the court, in viewing the evidence in the light most favorable to Plaintiff for purposes of this motion, assumes that occurred), it is undisputed that there was not enough time for the reasonable officer to stop it because of its short duration.

deliberate indifference standard did not apply to situations "where a prison security measure is undertaken to resolve a disturbance. . . that indisputably poses significant risks to the safety of inmates and prison staff."  475 U.S. at 320; *see also Hudson,* 503 U.S. at 6 (applying the *Whitley* standard to "a riot or a lesser disruption"); *Ort*, 813 F.2d at 323 (stating "[a]lthough *Whitley* was decided in the extremely volatile context of a prison riot, its reasoning may be applied to other prison situations requiring immediate coercive action").  The *Whitley* decision and its progeny hold that officers acting in the face of a prison disturbance should have their conduct reviewed through the lens of excessive force instead of deliberate indifference.  *Whitley*, 475 U.S. at 320-21; *Ort*, 813 F.2d at 323.  The court concludes that Plaintiff's claims do not allege that Officer Beechem was deliberately indifferent to Mr. Agee's mental health after the disturbance began, but rather that Officer Beechem was deliberately indifferent to Mr. Agee's mental health in his actions up to and including the use of deterrent spray.  Accordingly, the court will analyze Plaintiff's allegations under the law of deliberate indifference, and not the law of excessive force.

Eleventh Circuit precedent establishes the following test for determining whether a prison official has been deliberately indifferent to the medical needs of a prisoner:

> A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment. *Marsh*, 268 F.3d at 1028. A Fourteenth Amendment violation occurs when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk. *Id.* Furthermore, such risk must be an objectively substantial risk of serious harm to prisoners, and the prison official must respond to that risk in an objectively unreasonable manner. *Farmer v. Brennan*, 511 U.S. 825, 834, 844-45 (1994). Finally, a plaintiff must show that the constitutional violation caused the injury.  *Marsh*, 268 F.3d at 1028.

*Cottone v. Jenne*  326 F.3d 1352, 1358 (11th Cir. 2003) (some textual marks omitted).  This test has two subjective elements, two objective elements, and a causation element.  Further, "[t]he plaintiff

must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008). Indeed, the disregard must be "more than *gross* negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (emphasis added). When applied to the two instances of deliberate indifference Plaintiff alleges, this standard shows that both of Plaintiff's allegations fail as a matter of law.

First, Officer Beechem was not deliberately indifferent in failing to seek the aid of a mental health professional in this situation. In fact, the undisputed evidence is that Officer Beechem's confrontation with Mr. Agee began because Officer Beechem was *trying to get Mr. Agee to participate in a group therapy session*.[16] Moreover, Plaintiff has not alleged that Officer Beechem was subjectively aware of the "fact" that he should seek the aid of a mental health professional in every instance of a mentally-ill inmate refusing to comply with a direct and simple order. No prison could function in that manner and Plaintiff has not presented any evidence (or for that matter even an allegation) that Officer Beechem was under such a duty. *Whitley*, 475 U.S. at 325 (stating "[o]fficials cannot realistically be expected to consider every contingency or minimize every risk"). In any event, the court finds that Officer's Beechem verbal confrontation with Mr. Agee and his attempt to secure the chair from Mr. Agee was not objectively unreasonable and that Plaintiff has failed to plead any facts or produce any evidence that Officer Beechem's failure to seek the assistance

---

[16]The irony of Plaintiff's argument is not lost on the court—it is simply incredible that Plaintiff would allege a constitutional violation of failure to seek the help of a mental health professional when Officer Beechem was attempting to do exactly the thing Plaintiff claims he should have been doing.

of a mental health professional somehow caused Mr. Agee any harm.  Plaintiff's first claim, tottering

on the edge of frivolity, fails as a matter of law.

The second claim, that Officer Beechem's failure to use less violent means to subdue Mr.

Agee amounts to deliberate indifference, cuts no more ice than the first.  The force used by Officer

Beechem lagged behind the force used by Mr. Agee.  The undisputed facts show that Mr. Agee

responded to instructions with defiance, to Officer Beechem's attempt to seize the chair by jerking

the chair away with threats against the officer, and to the threat of being sprayed by the Freeze +P

by striking Officer Beechem with the chair.  At every point, Officer Beechem used less force than

Mr. Agee.  His restrained manner through these events, supported by all the evidence, shows that he

was not deliberately indifferent in trying to avoid the use of force.[17]

Finally, as to both of Plaintiff's theories of deliberate indifference to Mr. Agee's mental health

needs, Plaintiff has failed to plead or otherwise identify any cases that would show that Officer

Beechem's actions were in contradiction to clearly established law.  As a result, even if Plaintiff had

pled claims sufficient to withstand a motion to dismiss (which she has not), Officer Beechem would

be entitled to qualified immunity because Plaintiff has not pointed to any specific case with factual

similarities or any other clearly established law sufficient to strip Officer Beechem of that form of

immunity.  *Wilson v. Strong*, 156 F.3d 1131, 1134 (11th Cir. 1998) (stating "a plaintiff cannot strip

a § 1983 defendant of her qualified immunity by citing to general rules or abstract rights"); *Walker*

---

[17]Alternatively, the court notes that it would be proper to apply the excessive force analysis instead of the deliberate indifference standard to Officer Beechem's actions after the Code Red was called.  *See Whitley*, 475 U.S. at 320.  Since there is no dispute of the fact that the Code Red was called before Officer Beechem deployed the Freeze +P spray, Officer Beechem could only be liable for his use of the spray if he acted maliciously and sadistically toward Mr. Agee, an argument this court has already rejected in addressing the excessive force claim made against Officer Beechem.

*v. Schwalbe*, 112 F.3d 1127, 1132 (11th Cir. 1997) (stating "[q]ualified immunity focuses on the actual, specific details of concrete cases [and] [p]laintiffs may not discharge their burden by referring to general rules and abstract rights").[18]  Officer Beechem is entitled to qualified immunity with respect to Plaintiff's claim of deliberate indifference to Mr. Agee's mental health needs.

### D.    Deliberate Indifference to Mr. Agee's Medical Needs

Plaintiff's final claim against Officer Beechem is that he showed deliberate indifference to Mr. Agee's medical needs by (1) intentionally delaying getting Mr. Agee medical help and (2) failing

---

[18]The Supreme Court elaborates this point with crystal clarity in *Anderson v. Creighton*, 483 U.S. 635 (1987):

> The operation of [the qualified immunity] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."  *Davis, supra,* 468 U.S., at 195, 104 S.Ct., at 3019.  It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson*, 483 U.S. 635, 639-640 (1987)(footnote omitted).

to apprise the other officers of Mr. Agee's condition, including the fact that he had been sprayed by Freeze +P.  The court finds that Plaintiff has failed to plead facts sufficient to proceed on this claim.

First, there is no credible allegation that Officer Beechem caused any delay in getting Mr. Agee medical attention, intentionally or otherwise.  Officer Beechem participated in removing Mr. Agee from 5 Block into the corridor, where he was met by Captain Richburge.  Even assuming that Officer Beechem stood silent and said nothing to Captain Richburge or any other officers, the undisputed evidence is that Captain Richburge immediately ordered that several officers take Mr. Agee to the infirmary to be examined.  Officer Beechem's role was purely custodial and passive – he secured an inmate who had become defiant and violent, moved to a secure location away from other prisoners, and waited the minutes needed for his supervisor to arrive.  In fact, Captain Richburge stated in his deposition that he arrived on the scene and "saw the officers bringing inmate Agee out, escorting him out of the unit."  (Richburge Deposition at 12).  There is no evidence that any delay actually occurred.

Furthermore, the undisputed evidence shows that it took no more than fifteen minutes from the beginning of the verbal altercation between Officer Beechem and Mr. Agee and Mr. Agee's arrival in the infirmary.  While the Eleventh Circuit has allowed deliberate indifference claims to proceed where officers delayed access to medical care to a prisoner, these cases involved lengths of time much longer than the short timeframe involved here.  *See Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (delay of two and a half hours in getting inmate treatment for a visible and bleeding cut on his head); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (six hours between inmate breaking his foot and the time he received medical attention); *Hughes v. Noble*, 295 F.2d 495, 496 (5th Cir. 1961) (thirteen hour delay in allowing medical care to arrestee with a broken

neck).[19]   In light of this body of precedent, it is clear that only a credible showing the Officer Beechem intentionally delayed Mr. Agee's access to medical care could qualify as an instance of deliberate indifference.  Simply stated, Plaintiff has made no such showing.  She alleges that Officer Beechem acted with intent, but does not allege any facts that even hint at such intent.  She has produced exactly no evidence in the Rule 56 record.  Her allegations fall short of even the lenient pleading standards generally applicable in civil cases, much less the heightened standards applicable to constitutional claims where qualified immunity may be a defense. *Laurie v. Ala. Court of Crim. Appeals*, 256 F.3d 1266, 1275-76 (11th Cir. 2001) (stating that "[h]eightened pleading is the law of this circuit when § 1983 claims are asserted against government officials in their individual capacities") (quotations omitted).

Even if the court were to assume that Plaintiff's allegations are substantial enough to register as a constitutional violation, there is no allegation that Mr. Agee initially displayed objective signs of an injury that should have reasonably prodded Officer Beechem to try to get him medical attention faster.  It is undisputed that Mr. Agee was conscious, standing, and talking up to the time that he was handed off to the Transporting Officers.  While Officer Beechem knew that Mr. Agee had been involved in a violent altercation, there is no allegation that Plaintiff manifested symptoms or behaviors that objectively indicated the need for immediate medical attention.[20]  Moreover, not only

---

[19]The *Brown* court suggested in dicta that it was possible "to recognize as de minimus delays of a few seconds or minutes."  *Brown*, 894 F.2d at 1538.  This court does not rely on *Brown's* dicta as law, but does emphasize that *Brown* recognized that the existing precedent relied upon the length of time as relevant to *the existence* of a constitutional violation.  *Brown* did not set a minimum temporal threshold on deliberate indifference claims, but it did necessarily find that a court could find that some delays are simply too short to be actionable.

[20]Plaintiff cites *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989) for the proposition that Officer Beechem had a duty to seek immediate medical attention for Mr. Agee because Officer

has Plaintiff failed to allege facts sufficient to show that Officer Beechem intentionally delayed getting Mr. Agee medical attention, she has also failed to allege facts sufficient to show that he was more than grossly negligent in any alleged delay.  Mr. Agee did not display any serious or life-threatening injury, and it was more than reasonable for Officer Beechem to wait the few minutes needed to receive instructions from his supervisor.  Finally, the court sees no evidence or substantial allegation that Officer Beechem caused Mr. Agee's death or increased his suffering, even if his delay met the other requirements of deliberate indifference (which it does not).

For additional reasons beyond the analysis of Plaintiff's pleading the court finds that Officer Beechem is entitled to qualified immunity on this claim.  Even if Plaintiff's claim satisfies the pleading requirements of deliberate indifference claim, she has cited no case showing that Officer Beechem's actions were contrary to clearly established law.  The court has found no law that requires an officer to leave his post, retain custody of an inmate with whom he had recently had a violent altercation, and seek immediate medical attention without a supervisor's orders.  Any of these three reasons would justify Officer Beechem's actions in waiting a few minutes to get care for Mr. Agee.

Second, as to the Plaintiff's second claim of deliberate indifference to Mr. Agee's medical needs by Officer Beechem, the court finds that Plaintiff has not properly pled a deliberate indifference claim.  Plaintiff alleges that Officer Beechem did not tell Captain Richburge about Mr. Agee's condition after the altercation.  This allegation appears to have two parts.  Plaintiff urges that

---

Beechem knew that Mr. Agee had traumatic injuries, but *Barfield* does not support such a sweeping argument.  The plaintiff in *Barfield* complained to the guards that he was raped, but the guards refused to provide him any access to medical care.  883 F.2d at 939.  The alleged conduct in *Barfield* is far different than anything Plaintiff alleges in this case.  It was the utter refusal of the guards in *Barfield* to allow the plaintiff any access to medical care that makes that case factually distinguishable.

Officer Beechem should have told Captain Richburge about the extent of Plaintiff's injuries that resulted from the altercation in 5 Block and also that he should have specifically mentioned that he had sprayed Mr. Agee with Freeze +P.  There is no evidence that Officer Beechem failed to tell Captain Richburge these things; indeed, Captain Richburge testified in his deposition that he was told both that the officers had used physical force against Mr. Agee and that he had been sprayed by Freeze +P.  (Richburge Deposition at 22-23).

Assuming, however, that Plaintiff's unsubstantiated and implausible allegation that Officer Beechem did not tell Captain Richburge about the events of the altercation is true, Plaintiff still cannot show either that Officer Beechem's failure to inform was more than grossly negligent or that his failure caused Mr. Agee any harm.  Captain Richburge arrived, without being summoned by Officer Beechem, and took charge of the custody of Mr. Agee.  In these circumstances, assuming – contrary to the undisputed evidence – that Officer Beechem was completely silent, Officer Beechem was not grossly negligent in assuming that Captain Richburge had independent knowledge of the situation and did not need Officer Beechem to explain what happened.[21]  Moreover, Plaintiff has not alleged any facts that show that Mr. Agee was harmed in any way by Officer Beechem's alleged failure to inform.  Captain Richburge ordered other officers to take Mr. Agee to the infirmary immediately.  Plaintiff has alleged no facts that suggest that Plaintiff would have received better or more rapid medical care if Officer Beechem would have told Captain Richburge every detail of what happened.  There are no facts that even plausibly suggest that the extent of Mr. Agee's injuries were

---

[21]Also, the court views Officer Beechem's conduct as reasonable in light of the fact that Captain Richburge ordered other officers to take Mr. Agee to get medical attention.  It was not more than grossly negligent for him to assume that the medical personnel would know what aid Mr. Agee required.

apparent to an untrained observer, much less that they were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Andujar v. Rodriguez*, 489 F.3d 1199, 1203 (11th Cir. 2007) (citations and quotations omitted).  The court finds as a matter of law that Plaintiff's claims against Officer Beechem for deliberate indifference fail.

In addition, Plaintiff has not alleged facts to show that the law was clearly established. Instead, Plaintiff cites *Lancaster v. Monroe County*, 116 F.3d 1419 (11th Cir. 1997) for the proposition that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." 116 F.3d at 1425.  However, as discussed above, there is no evidence that Officer Beechem was subjectively aware of any life-threatening or serious condition that would be exacerbated by delay, no evidence that Officer Beechem acted with intent, and no evidence that there was any delay at all that was caused by Officer Beechem's action or inaction.  Instead, as Plaintiff has alleged in her complaint, Mr. Agee left Officer Beechem in the custody of several officers taking him to the infirmary walking on his own and with no visible or objectively-observable injury.  (Complaint at ¶ 28).  While there is no question that *Lancaster* is clear law, it is equally clear that Officer Beechem did not violate it.

### ii.    The Transporting Defendants

The second group of Defendants against which Plaintiff makes constitutional claims are the officers who transported Mr. Agee from the corridor outside 5 Block to the infirmary.  These Defendants are Officers Dean, Oden, Parler, Kukowski, and Freeman.  Plaintiff makes three claims against the Transporting Defendants, and the court will analyze them in turn.

A.      **Excessive Force**

The first claim that Plaintiff makes against the Transporting Defendants is for excessive force.  Plaintiff claims that the Transporting Officers threw Mr. Agee into a chair in the infirmary in such a forceful manner that he fell out of the chair and struck his head on a wall and on the floor. The court finds that Plaintiff's claim presents material issues of fact that preclude its dismissal or the entry of summary judgment on the issue of qualified immunity.

It is undisputed that Mr. Agee was handcuffed, incapable of walking, and not resisting the Transporting Officer's actions in any way when they arrived in the infirmary.  As a result, there was no legitimate basis for the Transporting Officers to use any force against him.  However, there is evidence that the Transporting Officers threw Mr. Agee into the chair with such force that the chair fell backwards and caused Mr. Agee to crash against the wall and the floor.  If these allegations are true, it is plausible that the use of force caused or contributed to Mr. Agee's death or other injury. This allegation of force is sufficient to preclude the dismissal of Plaintiff's constitutional claim and to make summary judgment inappropriate.[22]

---

[22]Obviously, the court does not find that all three officers against whom Plaintiff has viable claims acted in concert.  There is no evidence of plan between the officers to throw Mr. Agee into the chair.  The court's finding that material issues of fact preclude the entry of summary judgment in favor of these Defendants at this point does not necessarily mean that all of them are exposed to liability for excessive force.  Instead, the court is left with a thin factual record that does not allow for a determination of which officer or officers, if any, used excessive force.  Where the Rule 56 record shows a dispute of fact as to each officer, it would be inappropriate to dismiss any of the Transporting Officers from the case.  *See Skrtich*, 280 F.3d at 1302 (rejecting the argument that the court must analyze excessive force claims blow-by-blow in order "to determine which [officers], if any, used excessive force").  In its current state, the Rule 56 record could support a finding that Mr. Agee fell out of the chair because he was simply unbalanced, because he was accidentally dropped, or because he was thrown down with excessive force.  Because these facts are in dispute, the court cannot grant judgment as a matter of law.

### B.      Failure to Intervene as Excessive Force

The court can quickly dispose of Plaintiff's allegation that the Transporting Officers failed to intervene to prevent the use of excessive force against Mr. Agee.  There is nothing in the record to suggest that any of the officers could have reacted quickly enough to prevent Mr. Agee from being thrown into the chair.  This kind of sudden action provides an officer with no time to get himself into a position to intervene.  Plaintiff has no credible claim for failure to intervene against the Transporting Defendants.

### C.      Deliberate Indifference to Mr. Agee's Medical Needs

Plaintiff makes two allegations of deliberate indifference to Mr. Agee's medical needs against the Transporting Officers: (1) failure to examine Mr. Agee while taking him to the infirmary and provide necessary case and (2) failure to tell the infirmary staff of Mr. Agee's condition.  Plaintiff is not entitled to proceed on either of these allegations.

It is not deliberate indifference to fail to check for breathing or nausea when the officers were taking Mr. Agee to the infirmary for the simple reason that Mr. Agee was not harmed by their failure to stop.  There is no evidence that Mr. Agee stopped breathing at any point before he reached the infirmary.  In fact, due the ultimate fact that Mr. Agee died from internal bleeding, anything the Transporting Officers may have done to delay their progress towards the infirmary would have reduced Mr. Agee's access to the only medical care he needed.  Mr. Agee was not harmed by the officers failure to stop and check him.  No emergency first aid could have possibly aided a person in Mr. Agee's condition if he was injured in the way Plaintiff claims he was.

It also was not deliberate indifference to attempt to carry Mr. Agee to the infirmary instead of stopping in the corridor and seeking medical attention there.  There is neither an allegation nor

any evidence that Mr. Agee sustained any substantial visible injuries in his altercation with the officers in 5 Block. While upon careful examination of Mr. Agee, the Transporting Officers may (or may not) have been able to ascertain that Mr. Agee had sustained injuries to his torso, they would have had to delay getting Mr. Agee to the infirmary to make that determination. The officers are not doctors and the standard of care applicable to them is only that they should identified conditions "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Andujar v. Rodriguez*, 489 F.3d 1199, 1203 (11th Cir. 2007) (citations and quotations omitted). There is no evidence that any condition was objectively apparent to the Transporting Officers. Furthermore, there is no evidence that they had subjective knowledge of Mr. Agee's condition; however, even if such evidence could be found in the Rule 56 record, their decision to promptly transfer Mr. Agee to a place where he could receive medical care does not even approach the quantum of unreasonableness required to find a constitutional violation.

Second, as the Transporting Officers' failure to inform the infirmary staff about Mr. Agee's condition, there is no basis for finding a constitutional violation. According to Plaintiff's allegations, the Transporting Officers had a duty to inform the medical staff that Mr. Agee had become unresponsive during the time they were transporting him to the infirmary. (Complaint at ¶ 31). However, Plaintiff does not allege that the officers kept Mr. Agee from receiving medical treatment or impeded the medical staff's treatment. She can show no evidence that the staff needed input from the officers or that the medical staff was not immediately aware that Mr. Agee was unresponsive. Indeed, Plaintiff premises her allegations on the fact that Mr. Agee's condition should have been immediately and objectively obvious to the officers. If that allegation is true, certainly the medical staff would have been able to observe his condition as well as (if not more so than) the Transporting

Officers.  A deliberate indifference allegation premised solely the Transporting Officer's failure to inform is simply too speculative to satisfy the heightened pleading requirements for § 1983 claims, and there is nothing in the record to suggest the reasonable corrections officer would have known that the Transporting Officers violated Plaintiff's clearly established rights.

### iii.    The Supervisory Defendants

Plaintiff's makes a third set of constitutional claims against Defendants Richburge, Bullard, and Campbell.  The allegations against these Defendants arise out of their supervisory role at the time of the incident and are all brought as deliberate indifference claims.  The court will analyze the claims in turn after stating important rules of law applicable to all the claims against these Defendants.

The Eleventh Circuit summarized the law applicable to deliberate indifference claims against supervisors in *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003):

> "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); *Gonzalez*, 325 F.3d at ----, 2003 WL 1481583, at *4 (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability). Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Gonzalez*, 325 F.3d at ----, 2003 WL 1481583, at *5; *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at ----, 2003 WL 1481583, at *5 (quoting *Braddy v. Fla. Dept. of Labor & Employment*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at

----, 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at ----, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone*, 326 F.3d at 1360-61. In sum, Plaintiff can show the required causation in three ways: (1) a supervisor failed to take actions to address a history of widespread abuse that put the supervisor on notice that corrective action was needed; (2) the supervisor's customs or polices resulted in deliberate indifference; or (3) there are facts showing that the supervisor either directed his subordinates to act unlawfully or knew that they would act unlawfully and did nothing to stop them from doing so. *Id.* at 1360.

### A.      Deliberate Indifference to the Use of Excessive Force

Plaintiff's first claim against the Supervisory Defendants is that they were deliberately indifferent to the use of excessive force against Mr. Agee. This claim has three parts: (1) failure to provide adequate policies; (2) failure to train; and (3) failure to staff.

### 1.      Failure to Provide Adequate Policies

As to the first area, the failure to provide specific policies aimed at preventing the use of excessive force, Plaintiff's claims fail. Plaintiff argues that she can satisfy the causation requirement by showing that the Supervisory Defendants received notice of the use of excessive force through a steady stream of complaints from inmates. (Doc. # 82 at 44). Plaintiff does not mention that these complaints were routinely investigated and the vast majority were found to be without merit as a result of the investigations. (Bullard Deposition at 175; Doc. # 75-4, Declaration of Stephen Bullard at ¶ 12). In order for the complaints to put the Supervisory Defendants on notice that abuse was

actually occurring and that the policies were failing to address it, there would have to be evidence beyond the mere existence of the complaints. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("Brooks never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity"). The undisputed evidence is that there were no widespread complaints of abuse that were valid and actually put the Supervisory Defendants on notice of actual abuse. Furthermore, to the extent these reports had validity, the undisputed testimony is that the Supervisory Defendants addressed the issues. (Bullard Deposition at 159 (describing how Warden Bullard fired an officer involved in an instance of abuse and noting that the only other officer involved quit before he could be fired)). The fact that the Supervisory Defendants addressed the problems shows that they were not deliberately indifferent. *See West v. Tillman*, 496 F.3d 1321, 1330 (11th Cir. 2007) (finding no deliberate indifference where sheriff took actions to remedy actual problems reported to him, even though his remedial actions did not completely alleviate the problem).

Plaintiff has also failed to show that the Supervisory Defendants had a policy or custom that led to deliberate indifference. Though she has evidence that the *current* administrative regulation ("AR") governing the use of force was not in effect at the time when the altercation with Mr. Agee took place, she has not shown evidence that suggests that no such AR was in effect. In fact, the undisputed testimony shows that an AR addressing use of force was in place. (Doc. # 73-4, Affidavit of Jimmie Richburge at ¶ 9). Plaintiff has neither alleged nor produced substantial evidence showing that the AR in effect in January 2005 led to deliberate indifference.

Finally, there is no evidence that the Supervisory Defendants either told their subordinates to act unlawfully or had reason to suspect that they would. Plaintiff has failed to present any

evidence that there is a casual connection between the Supervisory Defendants' failure to provide specific policies and Mr. Agee's death.

## 2.     Failure to Train

Likewise, Plaintiff's generalized allegations are too insubstantial to state a deliberate indifference claim against the Supervisory Defendants' for failure to train the correctional officers not to use excessive force.  As noted above, there is no indication that the Supervisory Defendants had notice of a widespread pattern of excessive force.  Moreover, the Rule 56 record shows that there is no dispute as to the fact that the correctional officers were trained in the use of force regularly.[23] (Richburge Deposition at ¶ 6; Doc. # 73-3, Affidavit of Ruth Naglich at ¶¶ 4-5).  This training constituted the policy of the ALDOC and there is therefore no evidence of a policy to withhold training from officers.  Nothing suggests that the individual Supervisory Defendants had a policy or custom of undermining or overriding the training the officers received.  Finally, there is no evidence that the Supervisory Defendants instructed their subordinates to act unlawfully in defiance of their training or that they had reason to expect that their subordinates would do so.  Instead, the Supervisory Defendants reasonably expected that their subordinate officers would act in accordance

---

[23]Plaintiff argues that the Transporting Officers did not receive all of the training required by the AR relating to use of force.  There is no record evidence to support that assertion.  She has not provided any citation to the record for this assertion, citing instead to the AR which addresses training – an AR that says nothing about what training the individual officers actually received.  The court has no duty to dig through the record to make Plaintiff's argument for her.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment") (citations omitted).  On the other hand, there is affirmative evidence that correctional officers received regular training in this area.

with their training when applying force to inmates and Plaintiff's claim for deliberate indifference to the use of excessive force by failure to train cannot proceed.

### 3.        Failure to Staff

Plaintiff's third deliberate indifference to excessive force claim fares no better than her first two.  As an initial matter, neither Captain Richburge nor Warden Bullard were empowered to make staffing decisions.  (Bullard Deposition at 50-58).  Only Commissioner Campbell could make staffing decisions and thus only Commissioner Campbell could face liability for any failure to staff.

Plaintiff has shown that Warden Bullard complained often to Commissioner Campbell about the fact that Donaldson was, in Warden Bullard's opinion, understaffed in light of the amount of overtime that was required from the correctional officers.  (Bullard Deposition at 54-64).  Warden Bullard did not testify that Donaldson dropped below the minimum number of guards required to operate the prison in compliance with the Standard Operating Procedures.  (*Id*. at 68).  Instead, he used the term "understaffed" to mean that the correctional officers had to work too many hours and earned too much overtime, not that the prison could not meet the minimum personnel requirements. (*Id*. at 51).  Also, Captain Richburge stated that he had heard that Donaldson was short about seventy correctional officers from its target.  (Richburge Deposition at 72).  Plaintiff argues that this staff shortage supports a deliberate indifference to the correctional officers' use of force because stressed and tired officers have less patience with inmates.  (Doc. # 53 at 48).

There are two problems with that argument.  First, in making it she relies upon a case distinguishable from this one.  Second, there is simply no record evidence to support the assertion.

In support of her argument, Plaintiff cites *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). In *Greason*, the Eleventh Circuit held that a deliberate indifference claim for lack of staffing could

47

go forward against a warden who knew that a prison psychiatrist was unable to give adequate attention to the seventy-five patients to whom he had to attend during his once-weekly visits. 891 F.2d at 839-40. The court finds that *Greason* is distinguishable from this case.

In *Greason*, the supervisor knew or should have known that the psychiatrist could not adequately care for all the inmates. *Id.* at 840. Furthermore, he had actual knowledge that at least one prisoner was suffering from a lack of psychiatric care, a prisoner who eventually committed suicide. *Id.* Plaintiff has alleged no facts that show such a direct connection between any alleged staff shortages at Donaldson and Mr. Agee's death. She argues that the correctional officers at Donaldson would have been marginally less stressed if the staffing problems were less severe. She does not allege that there were actual staff shortages such that the required numbers of officers were not available. This claim is simply more speculative than the one in *Greason*. Simply stated, as the court found in *Greason*, it is impossible for one doctor to see seventy-five patients in one day a week; however, there is nothing to prevent correctional officers, even if they are working overtime hours, to retain the professionalism required to refrain from using excessive force. In *Greason*, the supervisor defendant had knowledge of a prior event that showed that the lack of psychiatric care was leading to increased danger to the inmates. *Id.* at 840. This court finds that the existence of prior warning is another critical distinguishing factor. In denying a deliberate indifference claim, the Eleventh Circuit has elsewhere held that actual knowledge of a problem resulting from lack of staffing is significant. *West*, 496 F.3d at 1329 (supervisor defendant had actual knowledge that lack of record-keeping personnel led to over-detention of prisoners).[24]

---

[24]In *West*, the court held that the supervisor defendant could not be liable for deliberate indifference in his failure to staff because he took actions, including seeking new employees and requiring *existing employees to work overtime*, aimed at addressing the staff shortage. 496 F.3d at

Likewise, Plaintiff's argument is wholly unsupported by the record.  There is a substantial difference between (1) a Captain being unhappy with having to pay out large sums for overtime and (2) evidence that the officers who confronted and transported Mr. Agee were suffering from any ill effects of working too many hours.  Even more telling is that there is no evidence that the lack of staff at Donaldson caused any actual instance of excessive force prior to the events leading to Mr. Agee's death.  Plaintiff's argument relies on staff shortages taking a toll upon the correctional officers and then the correctional officers using excessive force against Mr. Agee.  This chain of events is more speculative than any causal chain in *Greason*, *West*, or in any other case cited to the court by Plaintiff.  Accordingly, the court finds that Plaintiff's claim against Commissioner Campbell for deliberate indifference to the use of excessive force by means of lack of staffing fails as a matter of law.

### B.       Deliberate Indifference to Mr. Agee's Mental Health Needs

Plaintiff also claims that the Supervisory Defendants were deliberately indifferent to Mr. Agee's medical health needs.  While most of the issues relevant to this claim have been fully addressed in the discussion of Plaintiff's deliberate indifference to the use of excessive force claim, several issues require additional analysis.  Just as with her other deliberate indifference claim brought against all three Supervisory Defendants, Plaintiff alleges the following bases for holding that group liable: (1) failure to provide adequate policies; (2) failure to train; and (3) failure to staff as independent bases for holding the Supervisory Defendants liable for deliberate indifference.

Again, the resolution of a penultimate pleading matter is in order.  Plaintiff has not alleged that the Transporting Defendants were deliberately indifferent to Mr. Agee's mental health needs and

1330.

the court has already found that Officer Beechem was not deliberately indifferent to Mr. Agee's mental health needs in terms of how he handled his confrontation with Mr. Agee. As a result, the Supervisory Defendants can only be liable for deliberate indifference if Plaintiff can show that their actions or inactions led to the fatal altercation itself – apart from Officer Beechem's conduct – and that their failure to prevent the altercation caused Mr. Agee's death.

Perhaps anticipating this difficulty, Plaintiff relies heavily on a settlement in the case *Bradley v. Haley*, Civil Action No.: CV-92-A-70-N from the United States District Court for the Middle District of Alabama. In the *Bradley* settlement, ALDOC acknowledged deficiencies in its care and treatment of inmates with mental health concerns and agreed to a process for improving the care it provided those inmates. (Doc. # 83-9, Bradley Settlement). The *Bradley* settlement was signed in September 2000. (*Id*. at 10). On December 12, 2003, Dr. Jane Haddad issued a report, called for in the Bradley settlement, outlining the progress ALDOC had made in providing mental health care to inmates. (Doc. # 83-10, Haddad Report). The Haddad Report noted that ALDOC had made significant improvements in all areas, including training, staffing, procedures, and facilities. (*Id*. at 3-6).

Plaintiff argues that the *Bradley* litigation put the Supervisory Defendants on notice of severe problems in the care of inmates with mental health needs. (Doc. # 82 at 50). Plaintiff's argument is right as far as it goes, but Plaintiff ignores, or at least underestimates, the import of the Haddad Report that noted that ALDOC had substantially met the *Bradley* targets. Instead of showing that the Supervisory Defendants were deliberately indifferent to the mental health needs of Mr. Agee, the *Bradley* litigation and its aftermath show that the people responsible for setting and implementing

50

policies made tremendous and continuing progress *before* the events that caused Mr. Agee's death. Plaintiff's misplaced over-reliance upon the *Bradley* settlement is fatal to each of her claims.

### 1.      Failure to Provide Adequate Policies

Plaintiff alleges that the failure of the Supervisory Defendants to propound adequate policies operated as deliberate indifference to Mr. Agee's mental health needs.  In particular, she argues that the Supervisory Defendants failed to implement the procedures required by the *Bradley* settlement until after Mr. Agee's death.  However, the Haddad Report, placed in the Rule 56 record by Plaintiff, shows that the policies required by *Bradley* were in place in 2000, five years before Mr. Agee's death.  (Haddad Report at 2-4).[25]

To the extent that the *Bradley* settlement put the Supervisory Defendants on notice of the need for new policies, the Haddad Report confirmed that the needed policies were in place.  Plaintiff has not pointed to any policies called for in the *Bradley* settlement that were not in place in January 2005.

Moreover, and in any event, Plaintiff has not even alleged facts sufficient to show that the altercation with Mr. Agee was caused by the absence or inadequacy of a policy.  Plaintiff does not assert (except by conclusory argument) what policy could have prevented Officer Beechem from trying to get Mr. Agee to participate in a group therapy session.  Nor has she pointed to any basis for concluding that any failure to have a particular policy was the cause of Mr. Agee's death.  And even assuming (in contradiction to the undisputed facts in the record) that Plaintiff could show some causation between the failure to have a policy and Mr. Agee's death, Plaintiff's claims would still fail

---

[25]Notably, the Haddad Report does not include refinements or additions to existing policies as an area needing improvement.  (Haddad Report at 7-8).

because she has not shown that the Supervisory Defendants were deliberately indifferent in any failure to adopt or implement any policies.  If anything, the Haddad Report shows that the Supervisory Defendants were making significant progress[26] towards providing ideal mental health care and the court finds that such notable progress is inconsistent with a finding of deliberate indifference here.  This claim fails as a matter of law.

## 2.    Failure to Train

The failure to train claim is also due to be dismissed.  This claim is premised solely on Plaintiff's allegation that the correctional officers did not receive adequate training.  (Doc. # 85 at 56-57).  She has produced no evidence supporting this allegation.  On the other hand, Defendants have directed the court to several places in the Rule 56 record where various sources affirm that all officers were trained.  (Haddad Report at 3; Beechem Declaration at ¶ 13; Richburge Deposition at 47-51).  Plaintiff asserts that these sources of evidence "only create factual disputes," but Plaintiff has offered no facts to show a lack of training.  (Doc. # 82 at 52 n.21).  Indeed, the *Bradley* settlement documents on which she premises her deliberate indifference to Mr. Agee's mental health claim shows that the correctional officers were provided with training.  (Haddad Report at 3).  Plaintiff's argument rests on mere allegation, an allegation too thin to survive even a common motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), much less a motion pointing out her failure to comply with the heightened pleading requirements applicable to her constitutional claims.

---

[26]Plaintiff's argument contains another imbedded assumption: that all of the Supervisory Defendants were in the position to affect ALDOC policy.  The court finds that she has failed to adduce sufficient evidence to show that either Captain Richburge or Warden Bullard had sufficient control over policy development to be held liable for the failure to adopt policies.

Moreover, even if Plaintiff could show that not all of the correctional officers received all of the training called for in the *Bradley* settlement, she has not made any plausible allegations that show that the Supervisory Defendants were more than grossly negligent in their indifference to training.  It is undisputed that ALDOC was engaged in training all of its correctional officers to deal with mental health issues.  While it may not be conclusively established that the provided training was perfect in every respect, perfection is not the standard.  *See West*, 496 F.3d at 1331-32 (finding that "the record does not support Plaintiffs' contention that the Supervisory Defendants ignored a need for further training; it shows that the Supervisory Defendants did respond to [known problems] by providing more on-the-job training. . . and by adjusting procedures").  The fact that the Supervisory Defendants engaged the training issue and addressed it shows that they were not deliberately indifferent to it or the problems that flow from lack of training.

Even more bizarre is Plaintiff's effort to use Captain Richburge's deposition testimony to show that he lacked training.  Plaintiff's counsel asked Captain Richburge to state, without observation of Mr. Agee's behavior, whether Mr. Agee's actions were consistent with a diagnosis of paranoid schizophrenia.  (Richburge Deposition at 44-45).  Captain Richburge responded that he could not know Mr. Agee's "train of thought at that particular time or what was his rational [sic]" (*Id*. at 45).  He also said that "I don't have an expertise in that area." (*Id*.).  Plaintiff's counsel then attempted to equate expertise with adequate training by asking "You don't have the training or expertise?" (*Id*.).  Captain Richburge replied that he had the necessary training.  (*Id*. at 46-47).  Based upon this flawed questioning and analysis, Plaintiff asks the court to find that a claim for deliberate indifference to lack of training lies against a correctional officer who cannot diagnose paranoid schizophrenic behavior without personal knowledge or direct observation of Mr. Agee's

actions.  For Plaintiff's proposed standard to be proper, the Supervisory Defendants would face

deliberate indifference liability for employing any officers who were not clinical psychiatrists and

a psychics.  The Supreme Court rejected this kind of argument in *City of Canton v. Harris*, 489 U.S.

378 (1989):

> In virtually every instance where a person has had his or her constitutional rights
> violated by a city employee, a § 1983 plaintiff will be able to point to something the
> city 'could have done' to prevent the unfortunate incident.  Thus, permitting cases
> against cities for their failure to train employees to go forward under § 1983 on a
> lesser standard of fault would result in *de facto respondeat superior* liability on
> municipalities.

489 U.S. at 392 (citations omitted).  Everyone in this case would agree that Mr. Agee's death is

tragic, but nonetheless a defendant's failure to be clairvoyant is not deliberate indifference, and this

claim is due to be dismissed.

### 3.      Failure to Staff

Finally, Plaintiff argues that the Supervisory Defendants were deliberately indifferent to Mr.

Agee's mental health needs by failing to provide adequate staffing.  This claim, like the others

against the Supervisory Defendants, fails as a matter of law.

Plaintiff asserts that her allegation that Officer Beechem was the only officer providing

mental health security for side 3 of 5 Block is sufficient evidence that there was a staffing shortage.

Even assuming that this argument is correct, Plaintiff has failed to allege any facts that suggest

causation.  The court has found that Officer Beechem was not deliberately indifferent to Mr. Agee's

mental health needs and although there is a question of whether he employed excessive force when

he kicked Mr. Agee, it is undisputed that he acted appropriately upon the conclusion of the

altercation.  There are no facts or allegations to suggest that the presence of any additional officers would have made a difference in the altercation.

Plaintiff cites the Eleventh Circuit's opinion in *Greason* for the proposition that "when understaffing appears to have contributed to a violation of an inmate's eighth amendment rights, a causal link exists between that violation and the city's policy if officials are aware of the staffing problem but fail to take corrective action." *Greason*, 891 F.2d at 838.  What is missing from Plaintiff's allegation is a causal connection between the claimed understaffing and Mr. Agee's death. In *Greason*, the record showed that a supervisor had direct knowledge that an inmate had suicidal tendencies, was receiving inadequate care, was engaging in self-mutilation, and that other inmates had similar problems.  *Id.*  None of these egregious facts are present in this case.  Even taking as true Plaintiff's allegations, there had never been a similar incident at Donaldson, much less an incident involving Mr. Agee or Officer Beechem.  The "causal link"– *i.e.*, some factual link suggesting that understaffing contributed to a violation of Mr. Agee's rights – contemplated by *Greason* is not present in this case.

Likewise, the court finds that the present case is more analogous to *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004).  In *McDowell*, the Eleventh Circuit rejected a failure to staff claim where the plaintiff premised his claim for injuries arising from a delay in medical transportation on the fact that budget shortfalls led to lower staffing levels at a county jail.  *McDowell*, 392 F.3d at 1292-93. The court held that plaintiff's claim was deficient because "the Board's budget practices that resulted in understaffing [do] not amount to a purposeful disregard that would violate any citizen's constitutional rights."  *Id.* at 1293.  Furthermore, the court noted that there was no evidence that a problem such as the one that the plaintiff suffered had ever occurred before and that "[t]o hold a

municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern." *Id.* Finally, *McDowell* reaffirmed that "a municipality can generally not be liable for a single act of negligence or misconduct." *Id.* (quoting *Anderson v. City of Atlanta*, 778 F.2d 678, 685 (11th Cir. 1985)).

Factually, the facts involving the death of Mr. Agee fall much more closely to *McDowell* than to *Greason*. Plaintiff is attempting to challenge a staffing decision that is at best tangentially related to Mr. Agee's injuries. Her claims lack the direct and personal knowledge present in *Greason*, instead alleging in a generalized manner that higher staffing levels would have made Mr. Agee's injuries less likely. Liability for deliberate indifference "cannot be dependent on the scant likelihood that [Commissioner Campbell's] budget decisions would trickle down the administrative facets and deprive a person of his constitutional rights." *Id.* at 1292. The court finds that the link between the challenged staffing decisions and the injuries is too attenuated to lead to liability for deliberate indifference. Plaintiff's claim fails as a matter of law.

### C.    Deliberate Indifference to Mr. Agee's Medical Needs

Plaintiff's final constitutional claim is that Captain Richburge was deliberately indifferent to Mr. Agee's medical health needs by failing to ascertain his condition when immediately outside of 5 Block. Plaintiff does not include any argument relating to this claim in her response brief, leading the court to conclude that she has abandoned this claim. However, in the interest of thoroughness, the court will alternatively address the argument as if it were not abandoned. Just as was the case with the court's analysis of the deliberate indifference claims against Officer Beechem and the Transporting Defendants, the court finds that Plaintiff's claim against Captain Richburge fails as a matter of law.

56

The undisputed testimony is that Captain Richburge arrived as Officer Beechem and Mr. Agee were exiting 5 Block.  Captain Richburge then ordered the Transporting Officers, none of whom had been involved in the altercation, to take Mr. Agee to the infirmary.  There is no credible allegation that Captain Richburge intended or caused any delay in getting Mr. Agee medical care as quickly as possible.  The court finds no conduct beyond gross negligence in his assessment of the situation or the orders he gave.  It is unclear what Plaintiff would have had Captain Richburge do differently, and, in any event, any other course of conduct would have carried at least the same degree of risk to Mr. Agee as the course taken.  Most importantly (and most essentially), there is no clearly established law that could have led Captain Richburge to know that his actions – sending Mr. Agee to the infirmary as soon as he determined that some medical care was needed – were unlawful. Therefore, even if Plaintiff's claim were not abandoned (and it is) and were sufficiently pled to survive a motion to dismiss (and it is not), Captain Richburge is entitled to qualified immunity.

    **b.**    **State Law Claims**

In addition to her constitutional claims, Plaintiff claims that Officer Beechem and the Transporting Defendants are liable under various theories arising under state law.[27]  The court will address the scope of state actor immunity first, and then consider the sufficiency of Plaintiff's allegations as to her claims, each of these in turn, together with issues arising out of state law immunities.

---

[27]The court's consideration of these state law claims is completely dependent upon its conclusion that at least one of Plaintiff's constitutional claims survives Defendants' motions.  Were there no remaining claims arising under federal law, the basis of the court's jurisdiction would cease and the court would exercise its discretion to dismiss Plaintiff's state law claims under 28 U.S.C. § 1367(c).

###### i.        State Actor Immunity

The Alabama Supreme Court recently restated the law applicable to state-actor immunity in

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000):

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>> (1) formulating plans, policies, or designs; or
>> . . .
>> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity
>> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000) (emphasis supplied).  While this standard is not identical to the federal qualified immunity analysis, it is sufficiently similar to obviate the need for a full and separate analysis.  State actors are not entitled to state-actor immunity when they act "willfully, maliciously, fraudulently, or in bad faith, beyond [their] authority, or under a mistaken interpretation of law."  *Id*.

The court has already established that there is a material issue of fact as to whether these Defendants used excessive force against Mr. Agee, and the legal standard that applies to the use of

excessive force is substantially similar to the language in *Cranman*: "force is deemed legitimate as long as it is applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm." *Skrtich*, 280 F.2d at 1300 (quotations, textual marks, and citations omitted). To allow the excessive force claims to proceed, the court necessarily found, under these facts, that some Defendants acted in either bad faith or maliciously and sadistically. Those findings hold in the state law context as well. The court does not imply that the analyses of state-actor immunity and federal qualified immunity are the same. Instead, the court offers the far more modest proposition that the facts that justified withholding qualified immunity in this case also justify withholding state-actor immunity. That is, the same material issue of fact that existed as to those federal claims exists as to the state claims. Accordingly, the court will turn to it's analysis of Plaintiff's claims.

### ii.    Wrongful Death

Plaintiff's first claim is that Officer Beechem and the Transporting Defendants are liable under Alabama's wrongful death statute, Ala. Code. § 6-5-410. Defendants have not moved to dismiss these claims. Because the court has found that the Defendants against whom Plaintiff makes her wrongful death claim are not immune from state liability, Plaintiff may proceed on this claim.

### iii.    Felonious Injury

Plaintiff's second claim, asserting a cause of action for felonious injury under Ala. Code § 6-5-370, requires a more searching analysis. This section of the Alabama Code provides that "[f]or any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender." ALA. CODE. § 6-5-370. Plaintiff asserts that this section creates an independent cause of action for felonious injury. (Doc. # 82 at 62). To the

59

contrary, Defendants cite *Lewis v. Fraudfelder*, 796 So. 2d 1067 (Ala. 2000), which states that "*Section 6-5-370 does not create a cause of action*; rather, it merely allows a plaintiff to *commence* a civil action even if the plaintiff does not pursue criminal prosecution of the defendant." *Lewis*, 796 So. 2d at 1070) (emphasis added, except emphasis on "commence" supplied). This language from *Lewis* guts Plaintiff's argument.

Moreover, "in Alabama there is but one cause of action for wrongful death." *Ala. Power. Co. v. White*, 377 So. 2d 930, 933 (Ala. 1979); *see also Cofer v. Ensor*, 473 So. 2d 984, 995 (Ala. 1985) (stating "the fact remains that can only be one action for wrongful death"). These authorities show that Alabama law does not provide a cause of action under Alabama Code § 6-5-370 when the alleged injuries result in death. Plaintiff's claim for felonious injury is due to be dismissed as failing to state claim for which relief may be granted.

  **c.  The Prison Litigation Reform Act and Administrative Exhaustion**

The final issue requiring resolution by the court at this point is whether Plaintiff's claims are subject to the administrative exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. This section provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Plaintiff does not dispute that if she is subject to this exhaustion requirement, she has failed to comply with this section. There is no evidence that Plaintiff pursued any administrative remedies at all. The court must therefore determine whether Plaintiff is subject to the exhaustion requirement of § 1997e.

The court is persuaded that Plaintiff is not subject to the exhaustion requirement. The statute states that the exhaustion requirement applies to actions brought "by a prisoner." *Id.* Section 1997e(h) defines "prisoner" to mean "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). There is no plausible argument that Plaintiff falls into any part of this definition, and Defendants do not argue that Plaintiff is in fact a prisoner. Instead, they urge that the court should view her as a constructive prisoner, standing in the shoes of Mr. Agee with respect to the PLRA just like she stands in his shoes for purposes of bringing these claims. (Doc. # 104 at 24-25). Defendants cite no cases interpreting the PLRA in this fashion. In fact, there are several persuasive decisions that reach the exact opposite conclusion. *See Simmons ex rel. Estate of Simmons v. Johnson*, 2005 WL 2671537 *2 (W.D.Va. Oct. 20, 2005) (stating "[s]ince the present action was filed following Mr. Simmons' death, he was no longer a confined prisoner at the time of filing"); *Netters v. Tenn. Dept. of Correction*, 2005 WL 2113587 *3 n.3 (W.D.Tenn. Aug. 30, 2005) (stating "the § 1983 claim brought by Davison, on behalf of plaintiff Rajai Davison, Dixon's next of kin, is not barred for failure to exhaust state administrative remedies"); *Greer v. Tran*, 2003 WL 21467558 *2 (E.D.La. June 23, 2003) (stating "[t]his action was not brought by James while he was 'a prisoner confined in jail, prison, or other correctional facility' because it was brought after his death when he ceased to be a prisoner. Thus, the statute is not applicable to any action on behalf of James"). It should also be noted that Plaintiff's *wrongful death* claim could not have been brought by Mr. Agee.

Against these authorities, Defendants cite law addressing who may bring an action under § 1983 context. The parties do not dispute that, in accordance with § 1983, this court is required to

consult Alabama's law to determine if Plaintiff may bring an action representing the interests of Mr. Agee. No Defendant has challenged that she may.  What Defendants omit is any reason why the court should read into the PLRA the same rules that apply in § 1983 actions.  They have cited no authority showing why the court should  borrow law from one area to the other, and the court sees no inherent contradiction in allowing Plaintiff to stand in Mr. Agee's shoes in some, but not all, respects.  In passing these two statutes, Congress included the relevant requirement in one, but not the other.  Plaintiff is not subject to the exhaustion requirement of 42 U.S.C. § 1997(e).

## VI.    CONCLUSION

For the reasons stated herein Defendants Bullard and Beechem's Motion for Summary Judgment is granted in part and denied in part.  Defendants ALDOC, Campbell,  Richburge, Dean, Freeman, Kukowski, Oden, and Parler's motion for summary judgment is granted in part and denied in part.  Specifically, Plaintiff's claims against Defendants Beechem, Dean, Freeman, Kukowski, Oden, and Parler for use of excessive force may proceed.  All other federal claims against these defendants are dismissed.  All claims against Defendants Bullard, Campbell, and Richburge are dismissed.  Moreover, Plaintiff's claim for wrongful death may proceed but her claim for felonious injury is dismissed.  The Defendants' two motions to strike are denied.  Plaintiff's motion to continue pursuant to Rule 56(f) is denied.

**DONE** and **ORDERED** this _____22nd_____ day of September, 2008.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE